IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CAROLYN HANKINSON,           )
           )
Plaintiff,           )
           )
v.           )
           )   Case No.  4:11-cv-2183-SPM
           )
           )
CAROLYN W. COLVIN,[1]        )
Acting Commissioner of Social Security,   )
           )
Defendant.           )

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of Plaintiff for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (collectively referred to as the "Act").  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 22).  For the reasons stated below, the Court affirms the Commissioner's denial of Plaintiff's applications for benefits.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case.

# I.  <u>PROCEDURAL HISTORY</u>

Plaintiff filed her applications for benefits under Titles II and XVI of the Act on December 17, 2008.  (Tr. 42, 123-36, 129-31, 196).  She originally claimed an onset date of August 31, 1975, but she amended the onset date to September 10, 2008.  (Tr. 123, 184).  She claimed disability due to bronchitis, depression, bipolar disorder, seizures, and posttraumatic stress disorder (PTSD).  (Tr. 201).  Plaintiff's applications were denied initially, and Plaintiff filed a request for a hearing by an Administrative Law Judge ("ALJ").  (Tr. 57-61, 66).  On January 15, 2010, a hearing was held before ALJ Michael D. Mance.  (Tr. 10-35).  Following the hearing, on March 25, 2010, the ALJ found that Plaintiff was not under a "disability" as defined in the Act.  (Tr. 39-55).  On May 14, 2010, Plaintiff filed a request for review of hearing decision with the Appeals Council.  (Tr. 7, 247-50).  On October 24, 2011, the Appeals Council denied Plaintiff's request for review.  (Tr. 1-5).  Thus, the ALJ's decision stands as the final decision of the Commissioner.

In appealing the Commissioner's decision, Plaintiff argues (A) that the ALJ failed to properly consider all of Plaintiff's severe medically determinable impairments, specifically her personality disorder; (B) that the ALJ's RFC assessment was not supported by "some" medical evidence; and (C) that the ALJ failed to properly consider several pieces of evidence related to Plaintiff's impairments.

## II.      FACTUAL BACKGROUND[2]

### A. BACKGROUND

On January 15, 2010, Plaintiff testified at a hearing before the ALJ.  Plaintiff was 52 years old at the time of the hearing, has a college degree in accounting, and is just short of her master's degree.  She resides in an apartment with her partner and her stepson.  (Tr. 15).

Plaintiff last worked in 2008 as a waitress, and before that she worked setting up displays in Lowe's stores across the country.  (Tr. 15-16).  She was let go from her job setting up displays because she could not handle the heights and because she has seizures.  (Tr. 16).

Plaintiff has a history of severe physical and sexual abuse by an ex-partner, and she testified that she cannot work because she is scared to leave the house.  (Tr. 16, 20, 201, 209).  Plaintiff has frequent flashbacks to her abuse and has horrible nightmares.  (Tr. 16).  The flashbacks can be triggered by certain days of the year, certain memories, or discussions in therapy about her past abuse.  (Tr. 26).  She feels the emotions several hours after the flashbacks, and sometimes she does not even know where she is or what year it is.  (Tr. 26-27).  She sometimes goes in the closet, hides in corners, and hurts herself by clawing at herself or beating herself with a belt.  (Tr. 16).  Plaintiff also testified that she has swelling and scarring in her brain from when she was severely abused.  (Tr. 20).

Plaintiff testified that she likes people a lot and that she is "the type of person that people will come up to in a store and carry on a conversation with."  (Tr. 23).  In addition, Plaintiff talks to her dog, her son, and her partner a lot; they are her support system.  (Tr. 17).  However, she

---

[2] The following is not intended to be an exhaustive summary of all of the records the Court has reviewed; the summary focuses on those most relevant to the issues presented in Plaintiff's appeal.

does not trust people very easily and does not deal well with stress.  When she is under stress, she becomes angry with herself and takes it out on her partner and son.  (Tr. 23).

Plaintiff testified that her doctors say that she has pseudoseizures and will have them all of her life.  They are brought on by stress.  (Tr. 24).  When she has one, she passes out or loses control of her body, shakes, and flops.  When she wakes up, she feels very tired and sometimes does not remember the seizure.  They last about a minute.  (Tr. 25).  Plaintiff testified, "I have not had a seizure in quite a long time, not a grand mal.  I had, until I was put on the medication and they, I learned to not get so excited which helped me."  (Tr. 20).

Plaintiff has been seeing a therapist for two and a half years, and she also has a psychiatrist.  (Tr. 17, 19).  She states that she has "become more of a person that [she] think[s] is good, not bad" and that she has "made great strides."  (Tr. 19).  Plaintiff testified that she sees her therapist once a week and talks to her at least two or three times a week on the phone.  (Tr. 19-21).  Asked why the therapy records did not verify weekly sessions, Plaintiff stated that she sometimes talks to her therapist on the phone and that she does not know if the therapist records everything.  (Tr. 21).

Plaintiff takes Klonopin (clonazepam)[3] and Prozac (fluoxetine);[4] she testified that they have "helped" and that she thinks she has "gotten a lot better."  (Tr. 16-17).  Even with her medication, however, she has problems with concentration and with finishing things that she sets out to do.  (Tr. 24).  Plaintiff testified that although she has been "doing well" and "doing a lot

---

[3] Klonopin is a brand name for clonazepam, which is used to control certain types of seizures and to relieve panic attacks; it is in a class of medications called benzodiazepines.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

[4] Prozac is a brand name for fluoxetine, which is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html

better," she cannot work on a permanent basis, 40 hours per week.  (Tr. 21-22).  She indicated that she might be able to work part-time to start off with, but "not right away."  (Tr. 22).

Plaintiff spends her days watching TV; doing chores around the house such as vacuuming, cleaning, and doing the dishes; reading (when she can concentrate); and doing web design things on the computer.  (Tr. 17-18).

Plaintiff was on probation at the time of the hearing; she spent six weeks in jail in 2008 for writing bad checks.  (Tr. 17, 577).

### B.  MEDICAL TREATMENT

Records from 2006 through Plaintiff's disability onset date of September 10, 2008, show a history of emergency room and clinic visits for seizures, anxiety, stress, depression, flashbacks, posttraumatic stress disorder, personality disorder, bipolar disorder, difficulty with sleep, and a history of past physical and sexual abuse.  (Tr. 274, 277, 279, 281-82, 285-86, 294-95, 299-300, 301-02, 343, 345, 382-84, 482-83, 485, 486, 487).  Plaintiff took several medications during this time frame, including Klonopin (a benzodiazepine), trazodone,[5] and Lexapro (escitalopram).[6] (Tr. 273, 280, 345-48, 384, 387, 482-83, 485-87).  Records also indicate a history of benzodiazepine-seeking behavior:  on April 16, 2008, an emergency room physician wrote, "This patient should never ever receive benzodiazepines from our emergency department again as she has clearly mislead [sic] us on at least one occasion about her place of residence and whether or not she has a physician."  (Tr. 387).

---

[5] Trazodone is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html

[6] Lexapro is a brand name for escitalopram, which is used to treat depression and generalized anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html

After Plaintiff's alleged disability onset date, Plaintiff continued to make frequent visits to emergency rooms and clinics to report similar symptoms.  On November 14, 2008, Plaintiff went to the emergency room with abdominal pain and diarrhea; while there, she displayed anxiety, and she stated that she had three seizures while in her hospital room.  (Tr. 325-27).  The doctor noted that her pain did not appear to be anatomically or biochemically supported and suggested that she could be suffering from somatic versions of psychiatric issues.  (Tr. 328).

On December 17, 2008, Plaintiff went to the Metropolitan St. Louis Psych Center and reported feeling overwhelmed and having a history of abuse.  (Tr. 503-12).  She appeared worried, slightly agitated, and overly dramatic, with a labile mood.  (Tr. 505).  Her illness level was rated as two to three on a scale of one to seven, with one being not at all mentally ill and seven being among the most extremely ill patients.  (Tr. 506).  She was diagnosed with PTSD, rule out borderline traits, and was assigned a Global Assessment of Functioning (GAF) score of 80.[7]  (Tr. 507).

From December 17, 2008 through December 20, 2008, Plaintiff was hospitalized at the psychiatric unit of St. John's Mercy Medical Center for exacerbation of bipolar disorder.  (Tr. 371, 374).  She reported depression for no apparent reason; flashbacks from previous physical and sexual abuse; becoming startled and frightened; becoming withdrawn and avoidant; crying very easily; having paranoid feelings that people are trying to harm her; and being unable to hold

---

[7] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994).

A GAF score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors" and there is "no more than slight impairment in social, occupational, or school functioning."  *DSM-IV*, at 32.

a job.  (Tr. 372).  Dr. Peter Zhang noted that Plaintiff was "slightly disheveled," "seem[ed] to be anxious and fidgety," and had a tearful and dysthymic affect.  Dr. Zhang diagnosed mood disorder not otherwise specified, rule out type 2 bipolar affective disorder, and he noted chronic mental illness.  (Tr. 373).  At discharge, it was noted that Plaintiff tolerated medications very well; her anxiety symptoms had diminished; her mood was improving; and she had been attending all group therapies and had benefited from the stress coping and problem solving discussions.  Her medications at discharge were Klonopin, Prozac, Seroquel (quetiapine),[8] and Medrol.  (Tr. 371).

On February 4, 2009, Plaintiff went to Crider Health Center for a psychiatric evaluation. (Tr. 475-77).  She reported that she was "getting better," but that she had some days when she did not want to leave her home.  (Tr. 475).  She was described as calm and cooperative, with good eye contact, regular speech, goal-directed thought process, good insight, and fair judgment. (Tr. 476).  Dr. Chandra Reddy diagnosed bipolar disorder type II, PTSD, anxiolytic dependence, and "P.D. NOS with borderline traits," and assigned a GAF score of around 60.[9]  (Tr. 477).

On March 11, 2009, Plaintiff returned to Crider Health Center and reported that she was upset that she had been denied disability and Medicaid; that she was feeling depressed; that she heard her abuser's voice when stressed; and that she had decreased appetite and sleep.  She was observed to be slightly irritable when she talked about Klonopin being the only medication that

---

[8] Seroquel is a brand name for quetiapine, which is used to treat schizophrenia and episodes of mania or depression in patients with bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html
[9] A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM-IV*, at 32.

helped with her seizures.  Dr. Reddy diagnosed bipolar disorder type II, PTSD, history of anxiolytic dependence, and personality disorder NOS.  (Tr. 703).

On April 15, 2009, Plaintiff returned to Crider Health Center and reported nightmares and flashbacks, feelings of paranoia, suicidal thoughts, and trouble sleeping.  She initially had exaggerated movements but later calmed down.  Dr. Reddy found her judgment and insight "questionable" and noted that "some of the sx's she endorses seemed exaggerated especially paranoia."  Dr. Reddy diagnosed bipolar disorder type II, PTSD, history of anxiolytic dependence, and borderline personality disorder.  (Tr. 701).  Her Prozac and Seroquel prescriptions were increased, and her Klonopin prescription was decreased.  (Tr. 701-02).

On April 17, 2009, Plaintiff went to the emergency room and reported having had two to four seizures that day.  (Tr. 600).  Her review of systems was positive for depression, anxiety, and insomnia.  (Tr. 601).  It was noted that she was taking Klonopin, Seroquel, and Prozac.  (Tr. 602).  A CT scan of the head was unremarkable.  (Tr. 604).  At discharge, Plaintiff was given information about pseudoseizures.  (Tr. 608-09).

On May 7, 2009, Plaintiff underwent an Initial Adult Assessment at BJC Behavioral Health.  Plaintiff reported panic attacks and nightmares related to her past abuse, difficulty staying asleep, and depression most days of the week.  (Tr. 573).  She reported a history of abuse, grand mal seizures, and headaches.  It was noted that Plaintiff's and Plaintiff's partner's "primary agenda during the interview was to get [Plaintiff's] Klonopin refilled."  (Tr. 574).  The evaluator diagnosed PTSD; sedative, hypnotic or anxiolytic dependence; and personality disorder, and assigned a GAF score of 60.  (Tr. 583).

Shortly after leaving BJC Health Care, Plaintiff went to the emergency room and stated that after being refused a medication refill by a doctor, she had started having seizures.  (Tr. 529,

583).  During the seizures, she was alert, talking, and shaking.  (Tr. 529).  She was alert and oriented, calm, and cooperative, with clear speech.  (Tr. 530).  It was noted that her episodes "fairly clearly have the characteristics of pseudoseizures."  (Tr. 535).  She was prescribed Klonopin for anxiety.  (Tr. 542).

On May 19, 2009, Plaintiff went to the emergency room, complaining of seizures starting the previous day and stating that she had been off of her medication for two days because the prescription ran out.  She reported that she had post-ictal headache.  (Tr. 610).  Her memory and judgment were normal, but she was anxious, with a flat affect.  (Tr. 611).  A head CT was unremarkable.  (Tr. 614).  She was prescribed Klonopin, Seroquel, and Prozac.  (Tr. 612).

On May 28, 2009, Plaintiff was seen at BJC Behavioral Health for a medical and psychiatric assessment by Christopher Maley, M.D.  (Tr. 584-88, 595-96).  She reported a long history of abuse; rapidly shifting moods; highs and lows; temper tantrums; locking herself in a closet and hitting herself with a belt; two previous suicide attempts; and hospitalizations.  (Tr. 584-85).  Dr. Maley noted that she made good eye contact and was quite conversant and eager to talk, that her speech was full and normal, that her flow of thought was logical and sequential, and that she was "happy today."  However, her affect was somewhat labile, at times she seemed near tears, and her insight and judgment were questionable.  (Tr. 586).  Dr. Maley diagnosed mood disorder, rule out PTSD; benzodiazepine dependence; borderline personality disorder; and questionable seizure disorder, and he assigned a GAF of 60.  Plaintiff stated she was overall quite pleased with her current medication regimen and that she felt that Seroquel had gone very far in keeping her mood more even.  Dr. Maley continued her medication regime of Klonopin (clonazepam), Prozac, and Seroquel.  (Tr. 587).

On July 9, 2009, it was noted that Plaintiff's GAF score at admission to Crider Health Center on December 9, 2008 had been 53, but that her current GAF score was 65.  (Tr. 706-07). It was also noted that Plaintiff "had a fair response to medication" but that "clinic staff did not know if she took her medication consistently."   (Tr. 706).   Her diagnoses were bipolar II disorder, moderate; PTSD, moderate; sedative, hypnotic, or anxiolytic dependence, severe; personality disorder NOS, borderline/dependency traits, severe; epilepsy, unspecified; and irritable bowel syndrome.  (Tr. 707).

Plaintiff returned to BJC Behavioral Health on several occasions in 2009.  On July 10, 2009, she reported increasing nightmares, reliving past trauma, low energy, poor sleep, and washing her hands "120+" times per day.  She was calm and cooperative, with a "fine" and euthymic mood.  She was noted to be on Seroquel, Prozac, and Klonopin.  (Tr. 593).  Dr. Holt diagnosed mood disorder NOS; PTSD, chronic, rule out obsessive-compulsive disorder (OCD); borderline personality disorder; and questionable seizure disorder, and assigned a GAF of 61. (Tr. 594).

On August 7, 2009, Plaintiff reported decreased mood swings and good headway with her counselor regarding her PTSD.  She indicated that her mood was better.  It was noted that she no longer wanted Seroquel and that it would be tapered off over the next week, with a bridge prescription for trazodone to help with insomnia.  Dr. Holt diagnosed PTSD; mood disorder, NOS; OCD; and borderline personality disorder.  (Tr. 592).

On September 4, 2009, Plaintiff reported that she was doing well, was continuing to take her medication, had a much improved mood, was getting out of the house more, was watching TV and enjoying it, was in a "good" mood, and had a euthymic affect.  She was diagnosed with PTSD and mood disorder NOS and prescribed Prozac and Klonopin.  (Tr. 591).

On October 2, 2009, Plaintiff indicated that she was "doing okay," that her mood had gotten better, that she had no depressive symptoms or distressing dreams, that she was calm and cooperative, and that her insight and judgment were good.  She was prescribed Prozac and Klonopin. (Tr. 590).

On October 13, 2009, Plaintiff went to the emergency room and complained of weakness, dizziness, and light-headedness over the past two days, and she was noted to be nervous, anxious, and depressed.  (Tr. 647-48).

On October 22, 2009, Plaintiff went to the emergency room and complained of cough, congestion, body aches, and diarrhea, and she was noted to be very abrasive and not cooperative. (Tr. 556-57).

On November 6, 2009, Plaintiff returned to BJC Behavioral Health, and it was noted that she was "doing well"; that her mood was good; that she was eating well, that her sleep had gotten a little better; that she had a better relationship with her partner; and that she was clean, tidy, smiling, calm, and cooperative.  She was prescribed Prozac and Klonopin.  (Tr. 589).

On November 12, 2009, at an emergency room visit related to a car accident, Plaintiff's mood, memory, affect, and judgment were noted to be normal.  (Tr. 662).

On December 11, 2009, Plaintiff went to the emergency room with hives and itching. (Tr. 671).  It was noted that she had taken her shirt off in the car and was waving her hands around, frightened that something was happening.  She reported having had a short "seizure" in the waiting room, during which she fell from her chair while being helped by her companion and talking the entire time; it lasted about one minute.  (Tr. 671, 678).  She was noted to be nervous, anxious, and agitated, and she exhibited disordered thought content.  (Tr. 672).

From February 7 to February 9, 2010, Plaintiff was hospitalized at St. Clare Health Center after having a sequence of seven grand mal seizures in a row shortly before she arrived at the emergency room.  (Tr. 740).  It was noted that Plaintiff appeared slightly confused and slow to respond and "appear[ed] post-ictal."  (Tr.  741).   An EEG was "essentially unremarkable." (Tr. 746).  A CT scan and MRI were "essentially negative."  (Tr. 474-49).  It was noted that Plaintiff was "paralyzed with anxiety" and was "extremely rude."  (Tr. 748).  Plaintiff was diagnosed at discharge with reported breakthrough seizure; seizure disorder; possible pseudoseizure; reported grand mal seizure; liver disorder with elevated AST and mildly elevated CPK, possibly due to the seizure event; generalized anxiety disorder; PTSD, history of sexual abuse; depression; and insomnia.  (Tr. 747).

On February 17, 2010, Plaintiff went to the emergency room and reported chest pain, shortness of breath, and a "general uneasy feeling."  (Tr. 753, 756, 761).  Plaintiff was highly agitated and fluctuated from anger to a more normal conversational tone.  (Tr. 753).  She was very anxious and tearful.  (Tr. 761).  It was noted that she displaced her anger to the medical professionals who were trying to help her.  EKG was normal.  (Tr. 754).  Discharge diagnoses were bipolar disorder and anxiety attacks.  (Tr. 761-64).

On February 18, 2010, Plaintiff went to the emergency room and stated that she was three to four  months behind on rent and was stressed.  (Tr. 719).  Plaintiff complained of depression, boredom, and inability to work.  Her GAF at admission was 59.  (Tr. 721).

During the 2006 through 2009 time frame, Plaintiff also underwent individual counseling with Jennifer Gadsky, M.S.W., L.C.S.W.  Plaintiff saw Ms. Gadsky on six occasions between October 2006 through January 2007, and again on approximately twenty occasions between July 2008 and October 2009 (Tr. 563-71).

At the 2006–2007 sessions, Plaintiff and Ms. Gadsky discussed Plaintiff's past trauma and abuse, flashbacks, panic attacks, anxiety, problems with household finances, relationship dynamics, strategies for healing from PTSD, and relaxation techniques.  (Tr. 563-65).

At the 2008–2009 sessions, Plaintiff and Ms. Gadsky discussed Plaintiff's stress regarding her financial situation, Plaintiff's relationship with her partner, Plaintiff's conflicts with other people, ways to manage Plaintiff's anxiety and stress, and self-care strategies.  (Tr. 565-71).  On July 9, 2008, Plaintiff reported that Lexapro and Klonopin were helping her but that she felt insecure about herself.  On July 15, 2008, Plaintiff reported that she had started a job and planned to work until her debt was paid off.  (Tr. 565).  On July 25, 2008, she reported feeling much calmer.  On August 4, 2008, Plaintiff seemed calm and composed and began a list of goals, and it was noted that she continued to attain and lose jobs.  On September 10, 2008, it was noted that she had been laid off work, that she had occasional insecurity, and that she had begun practicing self-affirmations to reassure herself.  (Tr. 566).  On November 26, 2008, Plaintiff vented her anxiety regarding finances, and they looked at specific strategies to help manage her anxiety and stress.  On December 3, 2008, Plaintiff spoke about her recent activities and conflicts with various people, and they continued to look at specific strategies to help her manage anxiety and stress.  (Tr. 567).  On December 20, 2008, Ms. Gadsky noted that Plaintiff's voice on the telephone was extremely devoid of affect.  (Tr. 568).  On August 4, 2009, Plaintiff stated that she had been doing fairly well and that she was getting along with her partner at that time, though there were issues that caused conflict.  On October 30, 2009, Plaintiff reported that she had been having "bad moods" lately, during which she felt depressed, sad, lonely, bored, and irritable and tended to snap at her family members and say hurtful things.  (Tr. 571).

13

### C. OPINION AND OTHER EVIDENCE

#### 1. OPINION OF JENNIFER GADSKY, M.S.W., L.C.S.W. – DECEMBER 14, 2009

On December 14, 2009, Ms. Gadsky completed an Assessment for Social Security Disability Claim. (Tr. 561-62). She noted that Plaintiff's history included numerous assaults as a result of an abusive relationship and indicated that Plaintiff has been working with psychiatrists and mental health professionals for most of her adult life. Symptoms of PTSD included recurring dreams, flashbacks, recollections, difficulty sleeping and concentrating, and hypervigilance. Symptoms of bipolar disorder included pressured speech, flight of ideas, distractibility, impulsiveness, bouts of fatigue, hopelessness, and depression. Ms. Gadsky wrote, "This patient is not capable of sustaining full-time employment due to her lack of emotional stability at this time." (Tr. 561)

Ms. Gadsky also completed an Assessment of Ability to Do Work-Related Activities (Mental) form. She stated that Plaintiff had a good or fair-to-good ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; function independently; be attentive/concentrate; understand, remember, and carry out complex, detailed, or simple job instructions; maintain personal appearance; and relate predictably in social situations. However, she opined that Plaintiff had poor or no ability to behave in an emotionally stable manner or to demonstrate reliability. She wrote, "Patient is intelligent, but her impulsivity is too high for a work environment, especially when stressed by life events." (Tr. 562).

#### 2. DISABILITY DECISION OF MISSOURI DEPARTMENT OF SOCIAL SERVICES (JULY 27, 2009)

On July 27, 2009, the Missouri Department of Social Services found Plaintiff qualified for MO HealthNet benefits because she was permanently and totally disabled. (Tr. 709-15). The Decision stated:

> The evidence presented at the administrative hearing established that Claimant is permanently and totally disabled and unemployable as defined by the Family Support Division.  Claimant suffers from depression and PTSD stemming from severe sexual and physical abuse.  Claimant suffers from agoraphobia, flashbacks, beats herself, and has been hospitalized for her emotional instability.  She meets the requirement of 20 CFR §404, Subpart P, App. 1 § 12.04 (2008) as the basis of her disability.  Claimant will not be able to engage in substantial and gainful employment within the next 12 months.

(Tr. 713-14).

### 3. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF GLEN D. FRISCH, M.D. – FEBRUARY 26, 2009

On February 26, 2009, Glen D. Frisch, M.D. filled out a Psychiatric Review Technique Form indicating that Plaintiff had affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders.  (Tr. 251).  He indicated that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.  (Tr. 259).

On the same day, Dr. Frisch completed a Mental RFC Assessment.  (Tr. 488-90).  He opined that Plaintiff had either moderate or no significant limitations in each of the areas assessed.  (Tr. 488-89).  He found that Plaintiff retained the ability to understand and remember simple instructions; could carry out simple work instructions, maintain adequate attendance, and sustain an ordinary routine without special supervision; could interact adequately with peers and supervisors in a work setting that has limited demands for social interaction; and could adapt to minor changes in a work setting that was within her physical abilities.  (Tr. 490).

### 4. SEIZURE DESCRIPTION FORMS

In December 2009, four individuals (Plaintiff's partner and three others) filled out forms describing Plaintiff's seizures they had witnessed.  Her partner reported "every day full body"

seizures and indicated that she had witnessed 99.9% of them over the past 3.5 years.  She stated that she had witnessed "80 plus" seizures.  She stated that Plaintiff sometimes loses consciousness, that her eyes roll back in her head, that she loses bladder or bowel control, and that she injures herself from flopping around hitting coffee tables.  Immediately following her seizures, she is very weak, spacy, and scared, and she does not remember what happened.  (Tr. 692).  The three other individuals reported similar symptoms; one had witnessed 75 seizures, and the other two had witnessed one each.  (Tr. 691, 693-94).

The record also contains a chart indicating that Plaintiff had between one and seven daytime seizures during each month of 2009.  In addition, it was stated that she has small seizures every night in her sleep.  (Tr. 682).

### D.  VOCATIONAL EVIDENCE

Vocational Expert (VE) Dolores Gonzalez testified before the ALJ.  (Tr. 28-33).  The VE testified that Plaintiff's past work was as a waitress, a collector, a telemarketer, a cashier, and a merchandise displayer.  (Tr. 29-30).  In the ALJ's first hypothetical, the ALJ asked the VE to consider an individual of Plaintiff's age, education level, and work experience who had no exertional limitations but who "should avoid even moderate exposure to unprotected heights and hazardous machinery, and the individual is limited to performing simple tasks only, which requires no more than occasional contact with the public and coworkers."  The VE testified that such an individual could not do Plaintiff's past work but could do work as a sticker (*Dictionary of Occupational Titles* #734.687-090; 280,160 jobs nationally, 6,320 in Missouri, and 2,990 in the St. Louis area) or an addresser (*DOT* #209.582-010, 153,530 jobs nationally, 4100 in Missouri, and 1,260 in the St. Louis area).  (Tr. 30).

The VE testified that those jobs would still be available for an individual who could have no contact with the general public and should not be employed in high production rate jobs. The VE testified, however, that no jobs would be available for such a person if the jobs needed to allow for "occasional disruptions, unscheduled disruptions of both work day and work week due to excessive absenteeism, inability to concentrate for a full eight hours in a work day, potential frequent periods of decompensation, and frequent absences." (Tr. 31).

Upon questioning by Plaintiff's attorney, the VE testified that a person who had up to seven seizures a month during the day that involved shaking and being on the floor would not be able to work competitively. (Tr. 33).

### III.   DECISION OF THE ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 10, 2008, the alleged onset date. He found that she had the following severe impairments: an anxiety disorder, pseudoseizures, bipolar affective disorder, and a post-traumatic stress disorder. He found that she did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 44). He found that Plaintiff had the residual functional capacity to perform "a full range of work at all exertional levels but with the following non-exertional limitations: she must avoid moderate exposure to industrial hazards and unprotected heights; she is limited to performing simple tasks only which require no contact with the general public as part of the job and no more than occasional contact with coworkers; and she should not work in any high production rate jobs." (Tr. 45). He found that Plaintiff was unable to perform her past work as a cashier, collector, and server. (Tr. 49). Relying on the testimony of the vocational expert, he found that Plaintiff was capable of making a successful adjustment to other work that

exists in significant numbers in the national economy.   (Tr. 49-50).   The ALJ therefore

concluded that Plaintiff had not been under a disability, as defined in the Act, from the alleged

onset date through the date of his decision.  (Tr. 50).

## IV.   GENERAL LEGAL PRINCIPLES

The court's role in reviewing the Commissioner's decision is to determine whether the

decision "'complies with the relevant legal requirements and is supported by substantial evidence

in the record as a whole.'"   *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting

*Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).   "Substantial evidence is 'less than

preponderance, but enough that a reasonable mind might accept it as adequate to support a

conclusion.'"   *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v.

Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).   In determining whether substantial evidence

supports the Commissioner's decision, the court considers both evidence that supports that

decision and evidence that detracts from that decision.   *Id.*   However, the court "'do[es] not

reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations

regarding the credibility of testimony, as long as those determinations are supported by good

reasons and substantial evidence.'"   *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th

Cir. 2006)).   "If, after reviewing the record, the court finds it is possible to draw two inconsistent

positions from the evidence and one of those positions represents the ALJ's findings, the court

must affirm the ALJ's decision.'"   *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting

*Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.   20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V.      DISCUSSION

The primary issues raised by the Plaintiff in her appeal are (A) whether the ALJ erred by failing to consider personality disorder as a severe medically determinable impairment; (B) whether the ALJ's RFC assessment was supported by "some medical evidence"; and (C) whether the ALJ improperly failed to consider certain pieces of evidence.

A.     WHETHER THE ALJ ERRED AT STEP TWO BY FAILING TO FIND THAT
       PERSONALITY DISORDER WAS A SEVERE IMPAIRMENT

Plaintiff first argues that the ALJ erred at Step Two by failing to find that Plaintiff's personality disorder[10] was a severe impairment.

To show that an impairment is severe, a claimant must show that he has (1) a medically determinable impairment or combination of impairments, which (2) significantly limits his physical or mental ability to perform basic work activities, without regard to age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 404.1521(a), 416.920(a)(4)(ii), (c); 416.921(a). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). Basic work activities include, among other things, understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and unusual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). Although the requirement of severity is not an "onerous requirement," it is "not a toothless standard." *Kirby*, 500 F.3d at 707.

The ALJ did not find that Plaintiff had a severe impairment of personality disorder; however, he did find that she had severe impairments of anxiety disorder, bipolar disorder, posttraumatic stress disorder, and pseudoseizures. (Tr. 44). The Court finds that decision was supported by substantial evidence.

As Plaintiff points out, some of Plaintiff's health care providers diagnosed her with

---

[10] "A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.08.

21

personality disorder.  (Tr. 475-57, 573-83, 584-88, 592-96, 701, 703).  In addition, as Plaintiff

notes, Plaintiff displayed some signs and symptoms that may support the diagnosis of personality

disorder, including signs of inappropriate hostility, oddities of thought and behavior,

disturbances of mood/affect, and impulsive behavior.  However, many of Plaintiff's treatment

providers considering these symptoms did not diagnose Plaintiff with "personality disorder," but

rather with posttraumatic stress disorder, mood disorder, and/or bipolar disorder.  (Tr. 373, 487,

561, 589, 590, 591, 747, 761-64).  The Court further notes that Plaintiff claimed in her disability

paperwork that she was disabled based on depression, bipolar disorder, posttraumatic stress

disorder, seizures, and bronchitis; she did not mention personality disorder.  (Tr. 201).  *See*

*Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding "the fact that [the plaintiff] did

not allege depression in her application for disability benefits was significant" in assessing the

ALJ's treatment of evidence of the plaintiff's depression).

Moreover, to the extent that the ALJ did err at Step Two by failing to find Plaintiff's

personality disorder a severe impairment, that error was harmless in this case.  Courts frequently

find that an ALJ's error at Step Two in failing to find a particular impairment severe does not

require reversal where the ALJ considers all of a claimant's impairments in his or her subsequent

analysis.  *See Spainhour v. Astrue*, No. 11-1056-SSA-CV-W-MJW, 2012 WL 5362232, at *3

(W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and

depression to be severe impairments at step 2, such error was harmless because the ALJ clearly

considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC.");

*Givans v. Astrue*,  No. 4:10-CV-417-CDP, 2012 WL 1060123, at *17 (E.D. Mo. March 29, 2012)

(holding that even if the ALJ erred in failing to find one of the plaintiff's mental impairments to

be severe, the error was harmless because the ALJ found other severe impairments and

considered both those impairments and the plaintiff's non-severe impairments when determining Plaintiff's RFC); *see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("If you have more than one impairment.  We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity.").

Here, the ALJ clearly considered all of Plaintiff's mental limitations, including those related to personality disorder, in his analysis after Step Two.  The ALJ specifically discussed two of Plaintiff's personality disorder diagnoses.  (Tr. 46-47).  In addition, he discussed many of the symptoms Plaintiff or her doctors identified as being related to her personality disorder, including Plaintiff's reports of being stressed and hearing voices; reports of flashbacks from prior physical and sexual abuse; complaints of depression and suicidal ideation; an observation that Plaintiff had exaggerated movements that seemed to be dramatic; a diagnosis with mood disorder; Plaintiff's doctor's decision to increase her Seroquel dosage; the fact that Plaintiff had been in jail for writing bad checks; and the fact that Plaintiff's therapist had stated that she had a lack of emotional stability.  (Tr. 46-48).  The ALJ also considered Plaintiff's subjective statements regarding her mental limitations and conducted a proper analysis of the credibility of those statements.  (Tr. 46-48).  The ALJ then accommodated those mental limitations he found credible by restricting Plaintiff to "simple tasks only which require no contact with the general public as part of the job and no more than occasional contact with coworkers."  (Tr. 45).  This analysis demonstrates that the ALJ adequately considered the limitations attributable to Plaintiff's personality disorder, whether or not he found her "personality disorder" to be a severe impairment in addition to her anxiety, PTSD, and bipolar disorder.  *See Wise v. Astrue*, No. 11-0864-CV-W-JCE-SSA, 2012 WL 3156763, at *4-*5 (W.D. Mo. Aug. 2, 2012) (finding no error

at Step Two based on the ALJ's failure to find that a plaintiff's bipolar disorder was a severe impairment, where the plaintiff's mental condition had been "diagnosed in various ways," the ALJ found Plaintiff had a severe impairment of personality disorder, and the RFC included limitations in the same areas the plaintiff attributed to bipolar disorder).  As such, any error at Step Two was harmless.

### B.   WHETHER THE ALJ'S RFC ASSESSMENT WAS SUPPORTED BY "SOME" MEDICAL EVIDENCE

Plaintiff's second argument is that the ALJ's RFC Assessment was not supported by "some" medical evidence.  She suggests that the ALJ should have further developed the record by obtaining additional medical evidence.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).  "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001).  Therefore, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  *Id.* at 712 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

The Court finds that in this case, the ALJ's assessment of Plaintiff's RFC was supported by medical evidence addressing Plaintiff's ability to function in the workplace.

First, as the ALJ indicated, many of Plaintiff's medical and other records indicated that her mental symptoms were improving and were at least partially controlled when Plaintiff took her medications and went to therapy.  (Tr. 48).  After a three-day hospitalization in December 2008, it was noted that Plaintiff had tolerated medications very well; that her anxiety symptoms had diminished; that her mood was improving; and that she had benefited from stress coping and problem solving discussions in group therapy sessions.  (Tr. 371).  In February 2009, Plaintiff reported that she was "getting better," and she was calm and cooperative.  (Tr. 475-76).  In May 2009, Plaintiff reported that she was overall quite pleased with her medications and that she felt that Seroquel had gone very far in keeping her mood more even.  (Tr. 47, 587).  In July 2009, she was calm and cooperative, with a "fine" mood.  (Tr. 594).  In August 2009, she reported that her mood was better and that she no longer wanted to be on Seroquel.  (Tr. 592).  In September 2009, she was taking her medications, was doing well, had an improved mood, was getting out of the house more, and was watching TV and enjoying it.  (Tr. 591).  In October 2009, notes indicated that Plaintiff was doing okay, that her mood was better, that she had no depressive symptoms or distressing dreams, that she was calm and cooperative, and that her insight and judgment were good.  (Tr. 47, 590).  On November 6, 2009, it was noted that Plaintiff was doing well, that her mood was good, that she had a better relationship with her partner, and that she was clean, tidy, smiling, calm, and cooperative.  (Tr. 47, 589).  On November 12, 2009, when she went to the emergency room following a car accident, her mood, memory, affect, and judgment were noted to be normal.  (Tr. 47, 662).  Moreover, at the hearing before the ALJ in January 2010, Plaintiff testified that her medications have helped, that she has "gotten a lot better," that she has been "doing well," and that she has made "great strides."  (Tr. 16-17, 19, 21).  All of this evidence supports the ALJ's finding that Plaintiff's mental limitations are not

25

completely disabling.  *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (finding the ALJ's RFC determination supported by substantial evidence where the ALJ concluded that medication controlled the claimant's condition); *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) ("'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'") (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)).

Second, the ALJ's RFC assessment is supported by Plaintiff's GAF scores, which consistently indicated that she had only moderate or mild symptoms.  Plaintiff's GAF scores were as follows: 53 on December 9, 2008 (Tr. 706-07); 80 on December 17, 2008 (Tr. 507); 60 on February 4, 2009 (Tr. 477); 60 on May 7, 2009; 65 on July 9, 2009 (Tr. 706-07); 61 on July 10, 2009; and 59 on February 18, 2010 (Tr. 721).  A GAF of 51-60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupation, or school functioning."  *DSM-IV*, at 32.  A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*  These moderate GAF scores support the ALJ's assessment.

Third, the ALJ's RFC assessment is supported by many of the opinions of Jennifer Gadsky, M.S.W., L.C.S.W., Plaintiff's treating therapist.  (Tr. 48).  Ms. Gadsky indicated that Plaintiff had a good or fair-to-good ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; function independently; be attentive and concentrate; understand, remember, and carry out simple or complex job instructions; maintain personal appearance; and relate predictably in social situations.  (Tr. 562).  These opinions support the ALJ's finding that Plaintiff was capable of performing simple tasks and having some

26

interactions with coworkers.  Although the ALJ did not give weight to all of Ms. Gadsky's opinions, including her opinion that Plaintiff was too emotionally unstable to work, her other opinions do constitute evidence in support of the ALJ's RFC.

Fourth, the ALJ also properly noted that no psychiatrist who had treated the claimant has rendered a medical opinion that Plaintiff is unable to perform any type of work activity.  *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("[I]t is significant that no physician placed any limitation upon [the plaintiff's] work activities on the basis of his cognitive functioning.").  Even if, generally, "the absence of an opinion does not constitute substantial evidence," *Lauer*, 245 F.3d at 705, in this case the absence of such an opinion from a psychiatrist was simply one fact the ALJ properly considered in conjunction with the other evidence in the record.

Fifth, the ALJ adequately considered medical and other evidence related to Plaintiff's alleged seizure disorder in determining her RFC and restricting her to jobs in which she can avoid moderate exposure to industrial hazards and unprotected heights.  (Tr. 44-45).  The ALJ properly considered the fact that EEGs and MRI or CT scans of Plaintiff's brain have not revealed any abnormalities consistent with seizure activity, as well as the fact that no medical source had reported witnessing seizure activity.  (Tr. 47-48, 279, 474-78, 604, 614, 746).  *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (holding that it was proper for the ALJ to consider unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints).  In addition, Plaintiff testified at the hearing before the ALJ that she had not experienced a grand mal seizure in quite a long time.  (Tr. 20).

Finally, in considering Plaintiff's subjective complaints, the ALJ conducted a proper credibility analysis consistent with 20 C.F.R. §§ 404.1529, 416.929, and the framework set forth

in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).[11]   (Tr. 45-48).  In addition to considering Plaintiff's testimony, the objective medical evidence, and the effects of the treatment measures Plaintiff took (discussed above), the ALJ properly considered several factors that weighed against Plaintiff's credibility, including her poor work history; her statement to her therapist that she had started a job in July 2008 and was only planning to work long enough to pay off her debt; her statement that she "deserved" disability; her criminal history of passing bad checks; her history of making inconsistent statements to doctors in order to obtain benzodiazepines; the fact that treatment records were inconsistent with her claim that she saw her therapist on a weekly basis; and the inconsistency between Plaintiff's testimony that she was scared to leave her home and her doctor's statement that she was active in her church.  (Tr. 48).  *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability."); *Simmons v. Massanari*, 264 F.3d 751, 756 (8th Cir. 2001) (considering Plaintiff's history of conflicting statements, as well as a prior conviction for forgery, as factors weighing against Plaintiff's credibility); *Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (noting that inconsistencies in the plaintiff's statements were a factor for the ALJ to consider in assessing the plaintiff's credibility).  The Court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'"  *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

Given the above, the Court finds that the ALJ's RFC assessment was supported by substantial evidence, including medical evidence, and it will not disturb that decision.  *See id.*  at 556; *see also Travis v. Astrue*, 477 F.3d 1037, 1042 ("This court will not substitute its opinion

---

[11] Plaintiff does not challenge the ALJ's credibility determination.

for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence.").

C.   THE ALJ'S CONSIDERATION OF SPECIFIC PIECES OF EVIDENCE

1.   THE FINDING OF THE MISSOURI FAMILY SUPPORT DIVISION

Plaintiff first argues that the ALJ failed to consider the decision of the Missouri Family Support Division that Plaintiff was eligible for benefits.  That argument is without merit.  The ALJ expressly discussed and considered the decision of the Missouri Family Support Division as part of his evaluation of the evidence.  (Tr. 48).  However, as the ALJ correctly noted, that conclusion was not determinative or binding as to entitlement to Social Security disability benefits.  *See* 20 C.F.R. §§ 404.1504, 416.904 ("[A] determination made by another agency that you are disabled or blind is not binding on us.").  *See also Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996) (whether or not a plaintiff was disabled under state law is not binding on the Commissioner of Social Security).  The ALJ properly considered the state's decision but made his own independent disability determination based on the entire record.

2.   OPINION OF JENNIFER GADSKY, L.C.S.W.

Plaintiff also argues that the ALJ failed to properly consider the opinion of Ms. Gadsky, Plaintiff's licensed clinical social worker.

The Court first notes that a licensed clinical social worker is not an "acceptable medical source" under the regulations, but is rather an "other" medical source.  20 C.F.R. §§ 404.1513(a) & (d)(1), 416.913(a) & (d)(1); Social Security Ruling 06-03p ("SSR-06-3p") (noting that licensed clinical social workers are "other sources" and not "acceptable medical sources").  Thus, although Ms. Gadsky treated Plaintiff, Ms. Gadsky was not a "treating source" whose medical opinion may be entitled to controlling weight.  *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006); *see also* SSR 06-3p (noting that "only 'acceptable medical sources' can

29

be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").

The opinion of an "other" medical source must, of course, be considered by the ALJ in his analysis.   20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 06-03p.   "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p.  The ALJ has more discretion when evaluating an opinion from an other medical source than when evaluating an opinion from an acceptable medical source.  *Raney v. Barnhart*, 396 F.3d 1007, 1009 (8th Cir. 2005).

The ALJ properly considered Ms. Gadsky's findings and opinions in accordance with these guidelines.  He discussed her treatment notes and her opinions, including her opinion that Plaintiff was not capable of sustaining full-time employment.  (Tr. 47-48).  However, he explained that her opinion was "not consistent with her own assessment of [Plaintiff's] ability to do work related activities wherein she did not mark any area for occupational adjustments as being poor to none."  (Tr. 48).[12]  Indeed, Ms. Gadsky opined that Plaintiff had a good or fair-to-good ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; function independently; be attentive/concentrate; understand, remember, and carry out complex, detailed, or simple job instructions; maintain personal

---

[12]Plaintiff suggests that the ALJ mischaracterized Ms. Gadsky's opinions.  The Court disagrees. On the section of the form entitled "making occupational adjustments," Ms. Gadsky marked no areas as "poor to none."  (Tr. 562).

appearance; and relate predictably in social situations.  (Tr. 562).

As Plaintiff points out, Ms. Gadsky also opined (in the section of the form entitled "making personal-social adjustments") that Plaintiff had poor or no ability to behave in an emotionally stable manner and demonstrate reliability.  (Tr. 562).  However, the ALJ was not required to fully credit those opinions, or Ms. Gadsky's general opinion that Plaintiff could not be gainfully employed.  Even the opinion of a treating doctor, which is normally entitled to controlling weight, can be given less weight if the treating physician's own opinions are inconsistent.  *See Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions").  The ALJ properly considered inconsistencies within Ms. Gadsky's opinions, as well as the record as a whole, in declining to give that opinion controlling weight.  In addition, the Court notes that the decision about whether a claimant can be gainfully employed is "a task assigned solely to the discretion of the [Commissioner]."  *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991).  The ALJ was permitted to, and did, make his own independent judgment about whether Plaintiff could work.

In sum, the ALJ's evaluation of Ms. Gadsky's opinions fell within the available "zone of choice" of the conclusions the ALJ could have reached.  *See Hacker*, 459 F.3d at 936 (8th Cir. 2006) ("[T]his Court will disturb the ALJ's decision only if it falls outside the available 'zone of choice.'").

### 3.  *THIRD-PARTY SEIZURE REPORTS*

Plaintiff also argues that the ALJ failed to adequately consider third-party reports of Plaintiff's seizures.  I disagree.  The ALJ expressly cited these reports and stated that acquaintances had reported witnessing seizure activity.  (Tr. 48).  He considered that evidence in

conjunction with all of the other evidence related to Plaintiff's seizure activity discussed above, including the fact that an EEG, an MRI, and CT scans of Plaintiff's brain have not revealed any abnormalities consistent with seizure activity, the fact that no medical source had reported witnessing seizure activity, and the numerous factors that weighed against Plaintiff's credibility and thus against the credibility of her descriptions of her seizures.

The Court further notes Plaintiff's own testimony is somewhat inconsistent with at least some of the third-party reports regarding Plaintiff's seizures.  On December 10, 2009, Plaintiff's partner stated that Plaintiff had seizures "every day full body" and "more than one per week," and that she had grand mal seizures most of the time.  (Tr. 692).  However, at the hearing before the ALJ about a month later, Plaintiff testified that she had "not had a seizure in quite a long time, not a grand mal."  She indicated that medication and learning not to "get so excited" had helped.  (Tr. 20).

Finally, the Court notes that the ALJ did not completely disregard Plaintiff's allegations of seizures; rather, he accommodated Plaintiff's alleged seizure disorder by finding that she must avoid moderate exposure to industrial hazards and unprotected heights.  (Tr. 45).

## VI.    CONCLUSION

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence.  Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of March, 2013.